# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

**LINDA KATE KEENEY PASSANITI**     *     **DOCKET NO. 16-0281; SECTION "P"**

**VERSUS**     *     **JUDGE S. MAURICE HICKS**

**JAMES ROGERS**     *     **MAG. JUDGE KAREN L. HAYES**

## REPORT AND RECOMMENDATION

*Pro se* Petitioner Linda Kate Keeney Passaniti, an inmate in the custody of the Louisiana Correctional Institute for Women in St. Gabriel, Louisiana, filed the instant Petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 on February 29, 2016. [doc. #1]. Petitioner attacks her May 4, 2013, convictions for principal to second degree murder (count I), conspiracy to commit second degree murder (count II), three counts of principal to forgery (count III), and her sentences of life imprisonment without the benefit of probation, parole, or suspension of sentence for count I, thirty years at hard labor for count II, and ten years at hard labor for count III, imposed thereon by Louisiana's First Judicial District Court, Caddo Parish. This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of the Court.

## Background Facts

Petitioner, Linda Kate Keeney Passaniti, was convicted of principal to second degree murder, conspiracy to commit second degree murder, and three counts of principal to forgery. The victim, Ernest Luttrell, was the long-time domestic partner of Passaniti's mother, Loretta Bobbie Moore Luttrell. Passaniti, Loretta, Tina Vanmoerkerque, and Erin Crain conspired to kill Ernest. Passaniti was under financial strain, and wanted Ernest's money and the sixty acres of

land he owned in Keithville, Louisiana.

On July 25, 2010, Ernest was shot to death in his home by Eric Crain. To avoid the death penalty, Crain pleaded guilty to first degree murder with a sentence of life imprisonment and agreed to testify against Petitioner. Vanmoerkerque lived on the Luttrell property in a small trailer with her boyfriend. She worked as a housekeeper and personal assistant to Loretta. Vanmoerkerque pleaded guilty to second degree murder with a sentence of life imprisonment and also agreed to testify against Petitioner.

Loretta was arrested and charged with first degree murder. However, both Ernest and Loretta had been previously diagnosed with dementia. After her arrest, Loretta was diagnosed with severe Alzheimer's disease and declared mentally incompetent.

On May 4, 2013, a jury returned a verdict of guilty on all charges against Petitioner.

**Procedural History**

On February 3, 2014, Passaniti appealed her conviction to the Second Circuit Court of Appeal arguing (1) insufficient evidence to support her convictions of principal to second degree murder and conspiracy to commit second degree murder; and (2) the consecutive nature of her sentences rendered them unconstitutionally excessive. [doc. #43-21, p. 162]. On June 27, 2014, the appellate court affirmed Passaniti's convictions and sentence. *State v. Passaniti*, 144 So.3d 1220 (La. Ct. App. 2d Cir. 2014).

Arguing the same two issues, Passaniti filed an application for supervisory writ with the Louisiana Supreme Court. [doc. #43-22, pp. 64-67]. The Louisiana Supreme Court denied Passaniti's application, without explanation, on March 6, 2015. *Id.* at 231. Passaniti did not appeal to the United States Supreme Court.

On February 29, 2016, Passaniti filed the instant federal habeas petition asserting four claims for relief: (1) insufficient evidence; (2) excessive sentence; (3) ineffective assistance of counsel; and (4) actual innocence. [doc. #1]. She also moved to stay her petition so that she could exhaust state remedies as to claims three and four. [doc. #3].

On June 21, 2016, the undersigned issued a memorandum order directing Passaniti to amend her federal habeas petition to provide the following information, or dismiss her claims that cannot be cured through amendment:

1)     a list of the claims she wishes to present in her § 2254 petition, specifically identifying which claims are exhausted and which claims are not exhausted;

2)     the date she filed her application for post-conviction relief in the trial court, and a dated copy of Petitioner's application for post-conviction relief;

3)     a dated copy of any trial court order denying post-conviction relief;

4)     dated copies of any subsequent writ applications filed by petitioner on post-conviction review; and

5)     copies of any rulings on post-conviction review, or correspondence related thereto, from the appellate courts and/or the Louisiana Supreme Court.

[doc. #6]. On July 18, 2016, Passaniti filed a response in which she stated that she had not filed an application for post-conviction relief in state court, but that she planned on doing so. [doc. #10, p. 6]. Passaniti's only explanation for not having filed her application for post-conviction relief was that she "had not completed all the claims she plan[ned] to present for exhaustion as this matter is complex and the actors are numerous." *Id.*[1]

---

[1] On March 6, 2017, Passaniti filed an application for post-conviction relief with the state trial court arguing sevens claims for relief: (1) denial of due process; (2) newly discovered evidence; (3) ineffective assistance of counsel; (4) prosecutorial misconduct; (5) the State's key witness was not credible; (6) double jeopardy; and (7) exculpatory evidence. [doc. #43-22, pp. 306-323]. To date, it does not appear that the trial court has ruled on Passaniti's state habeas petition.

Thus, on August 4, 2016, the undersigned issued a report and recommendation recommending that Passaniti's motion to stay be denied for not showing good cause for failing to exhaust claims three and four prior to filing her § 2254 petition. [doc. #12, p. 4]. The Court further recommended that Passaniti's entire petition be dismissed without prejudice if Passaniti failed to file an amended petition within twenty-one days raising only her exhausted claims and deleting her unexhaustsed claims. *Id.* at 5-6.[2]

After the Court granted her three extensions of time to respond, Passaniti filed an amended petition on December 30, 2016, purportedly raising only exhausted claims:[3] (1) insufficient evidence; and (2) excessive sentence. [doc. #29]. She also moves the court to appoint her counsel. [doc. #30, p. 3].

On February 7, 2017, the undersigned issued a second report and recommendation recommending dismissal of Passaniti's unexhausted claims: ineffective assistance of counsel and actual innocence. [doc. #32].[4] Petitioner's purported exhausted claims were served on Respondent in accordance with a separate court order. *Id.* at 3.

Accordingly, on April 20, 2017, Respondent filed his response to Passaniti's claims. Passaniti did not file a reply. This matter is now ripe for decision.

## I.      Standard of Review – 28 U.S.C. § 2254

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 28 U.S.C. §

---

[2] The District Court adopted the report and recommendation on August 29, 2016. [doc. #13].

[3] As will be described more fully *infra*, claim two is unexhausted.

[4] The District Court adopted the report and recommendation on March 3, 2017. [doc. #40].

2254, governs *habeas corpus* relief. The AEDPA limits how a federal court may consider *habeas*

claims. After the state courts have "adjudicated the merits" of an inmate's complaints, federal

review "is limited to the record that was before the state court[.]" *Cullen v. Pinholster*, 131 S. Ct.

1388, 1398 (2011). An inmate must show that the adjudication of the claim in state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established Federal law "if the state court arrives at a

conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the

state court decides a case differently than [the Supreme Court] has on a set of materially

indistinguishable facts." *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting

*Williams v. Taylor*, 529 U.S. 362 (2000)). "The 'contrary to' requirement refers to holdings, as

opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-

court decision." *Id.* at 740. Under the "unreasonable application" clause, a federal *habeas* court

may grant the writ only if the state court "identifies the correct governing legal principle from . .

. [the Supreme Court's] decisions but unreasonably applies the principle to the facts of the

prisoner's case." *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts. Federal

courts presume such determinations to be correct; however, a petitioner can rebut this

presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). AEDPA has put into

place a deferential standard of review, and a federal court must defer to a state court adjudication

on the merits. *Valdez v. Cockrell*, 274 F.3d 941, 950 (5th Cir. 2001). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

## II.    Petitioner's Claims

### 1. Insufficient Evidence

Passaniti argues that there was insufficient evidence to convict her of principal to second degree murder and conspiracy to commit second degree murder. [doc. #30-1, p. 14]. She asserts that the principal offenders were Loretta, who was incompetent to testify at trial, and Vanmoerkerque, who only implicated Passaniti to avoid the death penalty. *Id.* at 15. Passaniti also claims that the testimony given by Mildred Jackson, Rose Jones, Vanmoerkerque, and Tawanda Daughtry was not credible. *Id.* at 18.

Passaniti argued this same claim on appeal in state court. The state court affirmed her conviction and sentence. When a *habeas* petitioner asserts that the evidence presented to the court was insufficient to support her conviction, the limited question is whether the state court's decision to reject that claim was an objectively unreasonable application of the clearly established federal law as set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Williams v. Puckett*, 283 F.3d 272, 278-79 (5th Cir. 2002). A conviction is based on sufficient evidence if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The *Jackson* inquiry "does not focus on whether the trier of fact made the

correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). Thus, a conviction may rest on sufficient evidence "even though the facts also support one or more reasonable hypotheses consistent with the defendant's claim of innocence." *Gibson v. Collins*, 947 F.2d 780, 783 (5th Cir. 1991).

In Louisiana, second degree murder is defined, in part, as the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm". LA. R.S. § 14:30.1(A)(1). "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." *Id.* § 14:24. Moreover, a criminal conspiracy "is the agreement or combination of two or more persons for the specific purpose of committing any crime" where "one or more of such parties does an act in furtherance of the object of the agreement or combination." *Id.* § 14:26.

Here, the Louisiana appellate court invoked and applied the *Jackson* standard, and it did not do so unreasonably. *See Passaniti*, 144 So.3d at 1231-34. The appellate court set forth the extensive amount of testimony and evidence presented at trial as follows:

> *The Agreement to Kill Ernest*
> Tina [Vanmoerkerque] testified that sometime during the spring of 2010 she heard the following statements made by defendant and Loretta during phone conversations (the speaker phone was on):
>
> • defendant needed money;
>
> • defendant instructed Loretta that if putting "him" in a nursing home does not work, she was to tell Tina to get the hit man to kill Ernest;
>
> • Loretta said that she agreed;
>
> • Loretta stated that she would speak to Tina about hiring a contract killer;

• defendant instructed Loretta that she needed to put more pressure on Tina to find a hit man;

• Loretta stated that Tina knew a hit man to take care of Ernest.

Loretta told Tina to find someone who would kill Ernest for $1,000 or she would be thrown off the property; she also gave Tina one of Ernest's handguns.

*Ernest's Murder*

On July 24, 2010, Tina ran into Eric Crain, the ex-boyfriend of her daughter, at a convenience store. According to Crain, they talked and made plans to hang out later that evening. The two met at a McDonald's Restaurant on Mansfield Road and while they were driving around, Tina asked him if he wanted to make some "quick money." She told Crain that:

• Loretta, the intended victim's wife, would pay him $1,000;

• she (Tina) and her employer's husband were "having a confrontation."

Crain agreed when he found out there was money involved, and Tina called Loretta to tell her that she had someone to do "the job" and that she would call her in the morning. Crain testified that his willingness to participate in Ernest's murder could have been based in part on the large amount of alcohol and drugs he had ingested during the course of that day and into the next one. He and Tina ordered pizza, "one thing led to another" and they had sex. They drank together, he took some more pills, and Tina had to go out around 2:00 a.m. to deal with her boyfriend, who was threatening to throw her out of their trailer.

During their time together at the motel, Tina gave him a snub-nosed chrome .44 magnum revolver that she said was hers, along with the following instructions:

• the killing would occur the next day;

• Loretta would be leaving to go to church early;

• Tina would drive him to the Luttrell home and drop him off;

• he was to enter through the side gate of the home;

• Loretta would leave the side door unlocked and turn the house alarm off;

• Ernest would either be asleep or in his recliner watching TV;

• he was supposed to make it look like a robbery;

• he was supposed to take Ernest's guns from the gun safe, his keys from a bowl on the kitchen counter, and his truck.

Tina told him to take the truck since she was dropping him off. After he was finished, Crain was to meet Tina at the Walmart on Pines Road. Crain testified that Tina told him that this information was from Loretta, but he did not ever speak to Loretta. He also testified that Tina never mentioned defendant's name or alluded to her identity. The only names he heard regarding Ernest's murder were Tina's and Loretta Luttrell's.

Tina testified that on the morning of Sunday, July 25, 2010, she called Loretta to tell her they were on their way. Loretta told Tina she was about to leave the house to go to church. On the drive to the Luttrell home, Tina and Crain talked through the scenario one more time. Tina dropped Crain off at the mailbox at the driveway to the Luttrell residence. Crain testified that he entered the house, shot and killed Ernest, and stole his keys, four guns and his truck. Dr. James Traylor, an expert in forensic pathology, testified that Ernest died from six gunshot wounds.

Crain was quickly arrested. While in jail, he called his boss and admitted to killing Ernest Luttrell, unaware that a news crew was present at his place of employment and recording his phone call on live air. Tina was arrested shortly thereafter. Both were charged with first degree murder, as was Loretta Luttrell (but as noted previously, because of her advanced dementia, she was declared incompetent to stand trial and remains in a treatment/nursing facility).

*Mineral Rights Sale*
In 2008, Ernest sold the mineral rights to his 60–acre tract for $400,000, purchased a $300,000 annuity in his and Loretta's name (with the surviving owner listed as the beneficiary of the annuity) and some CDs. He paid off the remaining balance of a loan, and deposited the remainder of the funds into accounts jointly owned with Loretta.

Loretta's half-sister, Rosie Jones, testified that defendant called her, upset about the sale of the mineral rights. Defendant asked Rosie if she could help defendant talk Ernest and Loretta out of the deal. According to defendant, they could make more money if they would wait. Rosie said that defendant was "really angry, frustrated, very upset" about Ernest's sale because she wanted Ernest's home and land; Kimberly Passaniti, defendant's daughter, was also upset about the sale because she had been told she would be getting Ernest's land and she wanted it to include the mineral rights. Tina testified that defendant and Kimberly refused to talk to Loretta for a long time because of the sale.

*The 2008 Notarial Testaments*
On April 24, 2008, Ernest and Loretta prepared notarial testaments. In their wills, each provided that should he or she die first, the surviving partner was to receive

everything. Both testaments stated that if Ernest and Loretta were to die at the same time, Rosie Jones would inherit the land and defendant and Kimberly would inherit the money. Ernest also told Rosie and her husband that, should anything happen to him and Loretta, they needed to go to the house as soon as possible and secure the wills. Ernest gave them the alarm code to the house as well as the safe combination and the business card of the attorney who had prepared the wills. Ernest did not trust defendant and her husband, Tony, and advised Rosie not to talk to them about anything and not to trust anything either of them said.

## Change in Defendant's Financial Condition

Some time in 2008, defendant quit her job as a professor at a local college in San Antonio and adopted a four-year-old child. She taught chemistry and mathematics at various universities. Her husband later lost his job in 2009. This put them in financial straits. Defendant allegedly has a bachelor's degree in chemistry, as well as masters' and doctoral degrees in applied mathematics from Johns Hopkins University. Tony Passaniti received a military retirement and had worked as a physician's assistant once he retired from the Air Force.

Kimberly Passaniti testified that Ernest, sometime between 2008 and 2010, promised to pay off a $70,000 debt she had accumulated in student loans. However, he refused to honor this commitment. Kimberly testified that she was not mad about it, and she did not remember "anything significant" about her mother's reaction to the news. On the other hand, Rosie testified that Loretta was aggravated about Ernest's refusal to pay off Kimberly's student loans. She told Rosie that Ernest had agreed to pay Kimberly's tuition, then later said that he wasn't going to pay it, but would give her $1,000. Rosie also testified that Loretta called her in June of 2010 to express concern about Mildred Jackson, Ernest's sister. Loretta told Rosie that defendant, Loretta, and Kimberly, were mad because they thought that Ernest was going to give "everything" away to Mildred. For that reason, Loretta tried to prevent Ernest from visiting his sister or her son.

## Diagnosis of Dementia

In 2009, Ernest and Loretta visited Dr. James May to be tested for dementia. Dr. May, an expert in the field of family medicine and a board certified practitioner, testified that both had mild dementia, but Loretta's condition was significantly more pronounced. He prescribed Aricept, a medication which slows the rate of dementia, to Ernest. Tina testified that Loretta was responsible for giving Ernest his morning and evening medications. Tina worked for Loretta for approximately five years. During that time, Loretta's condition deteriorated to the point where she was dependent upon Tina for almost everything.

## Phone Conversations

In 2010, not long before Ernest's murder, defendant learned about the wills Ernest and Loretta had written in 2008. Tina testified that defendant was furious when she found out that Rosie would get the land and she and Kimberly were to get the money.

Tina overheard several phone conversations between defendant and Loretta, who often talked with her phone on "speaker" mode:

   • defendant stated that she wanted more and instructed Loretta to change her will;

   • defendant stated that she wished that Ernest was dead;

   • defendant told Loretta to increase Ernest's Lortab and take away his Aricept to "drive him crazy or kill him;"

   • defendant stated that Ernest would "be better off dead."

During one of these conversations, Loretta told defendant that if Ernest were dead, she could pay off Kimberly's college expenses. According to Tina, both Loretta and defendant were angry that Ernest had reneged on his promise to pay off Kimberly's school loans.

Rosie testified that when defendant found out about the 2008 wills executed by Ernest and Loretta, she called her some time during the last week of June 2010 to question Rosie about the details of these wills. Defendant, who was agitated and upset, told Rosie that it was Loretta who told her about the wills. Defendant told Rosie that she was angry that Rosie herself had not told her about the testaments. When Rosie told defendant that she did not want anything from Ernest and Loretta, but would "sign her rights away," defendant calmed down and her attitude and tone changed. Defendant called her several times, as did Loretta and Kimberly, asking her to sign something renouncing her inheritance (under the 2008 wills). Nothing was done, and then after the murder of Ernest, when Loretta was arrested, defendant called Rosie again asking her if she would sign a document that renounced "her rights" to the Luttrells' property.

*The Health Care and Financial Power of Attorneys*
Defendant mailed Tina a power of attorney ("POA"); Tina testified that she, Loretta and defendant forged a health care POA ("HCPOA") for Ernest. The state entered a copy of this document into evidence; it designates defendant as having POA over the health care of Ernest Luttrell, is dated April 14, 2010, and is notarized by Ronald Norman. Tina testified that she signed as a witness, forged her own daughter's name as the other witness, and saw Loretta sign Ernest's initials and his name at the end of the document. Tina was adamant that Ernest never signed this or any other document that she signed as a witness for Loretta. Tina testified that she drove Loretta to Norman's store to have this POA notarized. Norman testified that he notarized the POA documents in the instant case without reading them and without requesting identification. He further stated that when he notarized the April 14, 2010, HCPOA, Loretta was alone when she came into his store; neither Ernest nor any witnesses were present.

Tina testified that while there was more than one HCPOA, she only participated in one forgery. Tina identified Loretta's handwriting on another HCPOA, and noted that she was familiar with Loretta's handwriting because she saw it every day.

Tina also identified, written in defendant's handwriting, Ernest's initials and name on another HCPOA. She stated that she knew defendant's handwriting from the letters defendant mailed to Loretta. Norman testified that he "signed" this same document without seeing Ernest or the witnesses sign, but stated that he did not "generate" this form; he also testified that he had never met or seen defendant. This HCPOA document was later discovered during the search of defendant's San Antonio home.

Tina identified defendant's handwriting on a financial POA ("FPOA") which is dated March 10, 2010. Norman testified that he notarized this document on March 10, 2010, in the presence of a man he was told was Ernest Luttrell, Loretta, and two witnesses, but that he only saw the man he thought was Ernest sign the document, not the witnesses (neither of which was defendant). According to Tina, defendant signed Ernest's name to this document, as well as the names of the two witnesses, who were Tina and Tina's daughter, Stacey Dew.

Tina identified Ernest's name in defendant's handwriting on two other FPOAs. Norman noted that his signature was on a second FPOA, but stated that he neither signed it nor wrote Ernest's social security number on it. Norman testified that he only notarized one financial document for Ernest and one for Loretta, and was unable to explain the subsequent documents. Norman identified his name on another FPOA, but stated that he did not remember notarizing this document either. He was adamant that he only notarized one FPOA for Ernest Luttrell. According to Tina, defendant also forged a FPOA for Loretta, and she forged Tina's name on that document because Tina did not sign a FPOA for Loretta. This FPOA was dated March 10, 2010, and was notarized by Ronald Norman.

Kimberly testified that defendant told her that she had power of attorney over Ernest's financial affairs. Defendant told her she also had power of attorney over Ernest's health care because he had been diagnosed with Alzheimer's and dementia and was starting to threaten the neighbor and cause problems. Defendant also related to her that she had financial power of attorney over Loretta's affairs. According to Kimberly, her mother's reasoning was that both grandparents needed more assistance and care than they were getting.

*Ernest's Commitment*

On April 30, 2010, David Ivey, a neighbor with whom Ernest had been arguing over property boundaries, received a call from Loretta, who told him that Ernest had taken one of his guns and gone to the back of their property after telling her that he was going to shoot David Ivey. At that time, Ivey called the sheriff's substation to report the threat as relayed by Loretta. Because Ernest had made a similar comment in the presence of one of the deputies previously, officers responded and took Ernest to

LSUHSC–Shreveport and he was admitted to the psychiatric ward.

While Ernest was committed, Tina, Loretta, and defendant visited, among other facilities, Pierremont Nursing Home to check into having Ernest transferred to the facility's secure Alzheimer's unit. According to Tina, defendant wanted Ernest "put away" so he couldn't give his money or property to his sister, Mildred Jackson. On May 5, 2010, a staff member from Pierremont called Ella Bradford, the case manager at LSUHSC, and informed her that Ernest's wife and daughter wanted him transferred to their facility; Ms. Bradford refused to release any information to the caller because no such release was authorized by the patient. Defendant also personally told Ms. Bradford that she wanted Ernest transferred to Pierremont.

On May 7, 2010, defendant called Dr. May and told him that she had HCPOA of Ernest and that she wanted Ernest to be placed in an Alzheimer's Unit in a nursing home. The staff at LSUHSC, however, found nothing sufficiently wrong with Ernest that warranted his transfer to a nursing home. That same day, Ernest was discharged and released home, unaware of defendant's or Loretta's actions.

Rosie testified that during Ernest's commitment at LSU, Loretta called her about Mildred and expressed concern that Mildred would "get everything" if something happened to Ernest. Mildred told Rosie that LSU would not let Mildred or defendant visit Ernest, and that they would not accept defendant's HCPOA. Defendant also called her during Ernest's time at LSU. She told Rosie that she had Ernest's HCPOA and wanted to put "everything" in Rosie's name. Rosie testified that she turned defendant down flat, and this subject never came up again.

*Ernest's Accounts*

Betty Jones, a manager at Capitol One, testified that defendant and Loretta visited her on May 5, 2010 (which is during the time of Ernest's commitment at LSUHSC), and that the following transactions occurred:

- defendant presented an FPOA allegedly executed by Ernest Luttrell dated March 10, 2010;

- defendant closed Ernest and Loretta's joint accounts, withdrew money from a CD, and transferred the money into accounts listing Loretta's name only, and made defendant's San Antonio address as the primary address for the account;

- Loretta closed an account and withdrew money from a CD;

- the $300,000 annuity was not disturbed;

- $24,535.69 was transferred from an account under Ernest's control, which left him with a balance of $397.37.

Ms. Jones described Loretta as being very upset, a little bit weak and fragile, "not getting around as well as she always had," and defendant as clearly being in control of the situation. Ms. Jones was given the following explanation:

> That Mr. Luttrell was in the hospital, that Ms. Luttrell was not allowed to go and see her husband. Her—Mr. Luttrell's sister—that they felt that the sister was trying to get to his money and that by taking his name off of anything, it would prevent the possibility of maybe the sister getting a power of attorney and having access to the funds. So if it was strictly in Loretta's name, that would prevent that.

Tina testified that she and Loretta made ATM withdrawals of money from Ernest's account during and after his commitment. Ernest wrote a check on May 12, 2010; the check later bounced. On May 13, 2010, Loretta called Ms. Jones and requested that the former accounts be restored so Ernest would not know what she and defendant had done while he was in the hospital.

*After Ernest's Funeral*
Loretta was arrested immediately following Ernest's funeral. Defendant stated in a television interview that Loretta could not have planned Ernest's murder because she was in an advanced state of dementia. Rosie testified that defendant began harassing her about giving her the documents and money Loretta and Rosie took from Ernest's safe immediately after his death.

She also made threatening phone calls to Rosie demanding that she sign over her "rights" and stay away from the Luttrell home. Rosie stated that she was afraid of defendant because of her erratic behavior and threats, but because defendant was back in San Antonio and she was in Arkansas, she was unable to get a restraining order against her. Money from Ernest's account continued to be withdrawn after his death and after Loretta's arrest and incarceration, sometimes on a daily basis and on some occasions two and three times a day.

*Ernest's 2010 Will*
A will purportedly executed by Ernest on July 1, 2010, was filed by an attorney representing defendant into the civil succession proceeding involving Ernest's estate which had been instituted shortly after Ernest's death. This filing raised the suspicions of Investigator Don Ashley because the attorney who filed it did so with a disclaimer that he could not vouch for the truthfulness or validity of the will he filed. Inv. Ashley contacted the notary of this will, Penny Penner, who admitted that on October 2, 2010, defendant visited her to notarize three copies of a "Last Will and Testament of Ernest Luttrell" and a "Last Will and Testament of Bobbie Loretta Moore Luttrell," both of which were dated July 1, 2010, and already signed. Penner admitted that she notarized the documents even though the dates on them were three months prior to the date that defendant brought them to her and without requiring the presence of Loretta or Ernest Luttrell. In fact, she knew that Ernest was dead and that

Loretta had been arrested and charged with his murder. During her testimony at trial, Penner stated that defendant told her she was having these wills notarized "after the fact" because she did not want her mother to lose everything while she was in jail. Penner testified that she thought she was helping Mrs. Loretta. Defendant told her that Ernest and Loretta had actually signed the wills in July, but just had not completed the process before Ernest's death. This will left everything to Loretta and if she died everything would go to defendant and defendant's children; in the 2008 wills Ernest and Loretta executed, should they die at the same time, the property would go to Rosie Jones and the money was to go to defendant and her children.

According to Penner, she decided not to lie for defendant anymore because "this was about a murder." Penner agreed to have her phone conversations with defendant recorded. Recordings of these phone calls were entered into evidence and played for the jury. Penner also turned over to Inv. Ashley an unopened envelope addressed to Penner from defendant, which contained a copy of a handwritten letter in which defendant laid out the scenario of what Penner was to say happened the day the wills were allegedly signed should she be questioned by authorities, as well as photographs of Ernest, Raquel Martinez (defendant's friend and the other witness to the forged wills), and Jessica (defendant's adopted daughter) for recognition purposes should the authorities ask her questions about the persons present for the signing of the wills.

After she was indicted by the Caddo Parish grand jury, defendant was arrested at her home in San Antonio, Texas. Defendant's home was searched twice and the following items were recovered:

• the original letter and original photographs mailed to Penny Penner;

• Ernest's military flag, which was thrown into a corner in the defendant's garage;

• a handwritten map of Ernest's home with information not published to the public (according to Inv. Ashley, this was a diagram of the Luttrell home and items that were marked or identified on it were pertinent to the case or murder scene. Eric Crain during his testimony stated that he never saw a diagram or handwritten map);

• a receipt for $373 from the Caddo Clerk of Court's Office for an August 2 order for 11 certified copies of a POA and 100 copies of another POA;

• a computer-generated receipt showing that the Passanitis had ordered a POA document from "Legacy Writer" for a POA for Loretta;

• handwritten notes made by defendant;

• a letter from defendant's husband written to the IRS and dated May 27, 2010,

stating that he and defendant were currently unemployed, that he had been looking for work, and that he was sending $100.00 to pay the interest on money they owed (this corroborated information from other sources about defendant and her husband's unemployment, which apparently began early in 2010 and coincided with defendant's sudden renewal of a close relationship with her mother Loretta);

• several copies of FPOAs for Ernest Luttrell with different and inconsistent signatures that were clear forgeries were found in defendant's home;

• several copies of HCPOAs for Ernest Luttrell with different, traced over, or forged signatures were found in defendant's home.

Tawanda Daughtry, an inmate at the Caddo Correctional Center in the same "pod" as defendant, testified that defendant told her the following information in May 2012:

• she was in jail accused of arranging her stepfather's murder;

• her stepfather had a lot of land and money from the Haynesville Shale;

• he was dead so "they" could collect the profits;

• she was going to beat the murder charge because she was nowhere near Louisiana when the murder took place and they would never be able to convict her of murder;

• she had made the documents on her computer from a website her husband showed her;

• if she was convicted of anything it probably would be the forgery charges; if so, all they would give her was probation, something that did not worry her;

• she was trying to hide from the DA's office the fact that she had money;

• she wanted a handwriting expert so she could "switch" her handwriting that even an expert couldn't tell;

• she initially wanted to slowly poison Ernest but changed her mind because poison could be detected in his blood;

• her mother's half-sister Rosie came up with the idea to make it look like Ernest was killed during a home invasion;

• they offered $1,000 to have Ernest killed;

• if everybody would have just shut up and not talked then nobody would have

been in jail;

• it was her plan to deny everything and put it all on her mom, who was unable to stand trial, and Rosie;

• she was "sunk" if the district attorney was listening to her phone calls;

• she told her "hired help" to shoot Ernest twice in the head to make sure that he was dead;

• she referred to the people who were hired as Tina and the "lawn guy" or Crain, a guy whom Tina was also sleeping with although she already had a boyfriend;

• at first they considered involving Chris, Tina's boyfriend, but he was too scared and wanted nothing to do with "it;"

• she had money problems which was the primary reason behind Ernest's murder;

Tawanda stated that she has been relocated to several correctional facilities because defendant threatened to kill her for cooperating with authorities and had other inmates make threats as well. She further stated that she was reluctant to testify because she feared for her family's safety because of all that defendant told her and the threats that were made against her.

Robert Foley, an expert in handwriting analysis, testified that he analyzed FPOA and HCPOA documents and a will dated July 1, 2010, compared them with several documents known to have been signed by Ernest Luttrell, and concluded that Ernest did not sign these documents. Foley noted "voluminous" differences between the known samples and the questionable ones. Foley had an investigator obtain handwriting samples from defendant. He observed that defendant intentionally distorted her own handwriting for her requested sample, and he could not reach a definitive conclusion whether the signatures on the POAs (or will) were made by defendant. However, Foley did testify that defendant's samples did not appear to be natural at all, but were so distorted that they could not be used for comparison. He felt that defendant's intentional distortion was made solely to thwart his ability to compare her handwriting with the signatures on the documents at issue.

*Id.* at 1223-31.

Applying the *Jackson* standard, the appellate court held that the aforementioned evidence was sufficient to support Petitioner's convictions of principal second degree murder and conspiracy to commit second degree murder. *Id.* The court reasoned,

Based on the testimony of Tina Vanmoerkerque and Tawanda Daughtry and corroborating evidence, the jury reasonably found that defendant actively desired the prescribed criminal consequences to follow from her acts. La. R.S. 14:10(1); *State v. Scott, supra*. In addition, the jury, and not this court, is given the duty of assessing the credibility of witnesses and the weighing the evidence. *State v. Dorsey, supra; State v. Gilliam, supra*.

In looking at the principal component, evidence of defendant's control and manipulation of her mother demonstrates that she was concerned in the commission of Ernest's murder by the direct or indirect counseling or procuring of another to commit the crime. In weighing this evidence, along with evidence about the handwritten map found in defendant's home, the jury could reasonably have concluded based on the evidence that defendant shared with Eric Crain and Tina Vanmoerkerque the specific intent to murder Ernest Luttrell.

In viewing the evidence in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found that the essential elements of the crime of principal to second degree murder were proven beyond a reasonable doubt.

*Id.* at 1232. The court further held,

Criminal conspiracy requires an agreement or combination of two or more persons for the specific purpose of committing any crime, an act in furtherance of the object of the agreement or combination, and specific intent. La. R.S. 14:26; *Louisiana State Bar Ass'n, supra*. The jury heard evidence that defendant instructed Loretta to ask Tina to find a hit man to kill Ernest. They also heard evidence of Loretta's agreement to the plan; Tina's recruitment of Eric Crain; and, Eric's fulfillment of the murder pursuant to a detailed set of instructions provided to him by Tina (who herself was given details by Loretta). Defendant and Loretta entered into an agreement together for the specific purpose of killing Ernest, and Loretta's act of directing Tina to find a hit man serves as an act in furtherance of their agreement. In viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of criminal conspiracy to second degree murder.

*Id.* at 1232-33.

The undersigned finds that the state court did not unreasonably apply the *Jackson* standard. The jury heard evidence that Passaniti told Loretta to ask Vanmoerkerque to find a hit man to kill Ernest. The jury also heard evidence of Loretta's agreement to the plan, Vanmoerkerque's recruitment of Crain, and Crain's fulfillment of the murder. The jury further heard evidence of Passaniti's financial struggles and motive to have Ernest killed. Passaniti's

complaints that certain witnesses at trial were unreliable do not warrant federal habeas relief. "[U]nder *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995); *see Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."); *Hebert v. Rogers*, No. 15-4950, 2016 WL 8291110, *11 (E.D. La. Nov. 14, 2016) (federal habeas courts are "explicitly prohibited from engaging in a credibility analysis"). "The *Jackson* standard, which focuses on whether any rational juror could have convicted, looks to whether there is sufficient evidence which, *if credited*, could support the conviction." *Id.* (emphasis added).

Petitioner's claim for relief based on insufficient evidence should be **DENIED and DISMISSED WITH PREJUDICE**.

## 2. Excessive Sentence

Petitioner argues that her sentence of life imprisonment is excessive, in violation of the Eighth Amendment. Specifically, she argues that Louisiana Revised Statute § 14:30.1, which mandates a sentence of life imprisonment for whoever commits the crime of second degree murder, is a statute based on retributivism rather than rehabilitation. [doc. #30-1, p. 13]. She contends that punishing her based on a theory of retributivism is disproportionate to the crime and "serve[s] no acceptable goal of punishment." *Id.* at 14. Respondent contends that claim two is unexhausted, and therefore cannot be considered, because Passaniti did not rely upon the arguments advanced here when she argued on appeal that her sentence was excessive. [doc. # 43-1, p. 26].

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to

the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State . . . ." 28 U.S.C. § 2254(b)(1)(A). The Fifth Circuit explained exhaustion as follows:

> The exhaustion requirement is satisfied when the substance of the federal claim is fairly presented to the highest state court on direct appeal or in state post-conviction proceedings, even if the state court fails to address the federal claim, or, if the federal claim is not fairly presented but the state court addresses it *sua sponte*. A claim is fairly presented when the petitioner asserts the claim in terms so particular as to call to mind a specific right protected by the Constitution or alleges a pattern of facts that is well within the mainstream of constitutional litigation.[5] It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made. Rather, the petitioner must afford the state court a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim.

*Johnson v. Cain*, 712 F.3d 227, 231 (5th Cir. 2013) (internal quotations marks and citations omitted). "State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

"A federal court claim must be the 'substantial equivalent' of one presented to the state courts if it is to satisfy the 'fairly presented' requirement." *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998). "This requirement is not satisfied if the petitioner presents new legal theories or new factual claims in his federal application." *Id.* Likewise, to have "fairly presented" a federal claim, a petitioner must have reasonably alerted the state courts to the federal nature of his claim. *Baldwin*, 541 U.S. at 29-32 (holding a petitioner failed to "fairly present" a claim of ineffective assistance by his state appellate counsel merely by labeling the performance of said counsel "ineffective," without accompanying that label with either a

---

[5] A petitioner does not "fairly present" a claim to a state court if that court must read either a brief before a lower court or a lower court's opinion to locate the claim. *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

reference to federal law or a citation to an opinion applying federal law to such a claim).

Here, it is clear from a review of the state court record that Petitioner has not exhausted this claim. On appeal in state court, Passaniti argued that her sentences were unconstitutionally excessive because they were consecutive in nature, doc. #43-21, pp. 180-83, whereas in the instant petition, she argues that her sentence of life imprisonment is excessive because the Louisiana legislature passes criminal laws based on a theory of retributivism rather than rehabilitation. Furthermore, Passaniti did not advance the instant argument in her recently-filed state court petition for post-conviction relief. [doc. #43-22, pp. 306-323]. "[W]here a petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement." *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) (citations and internal quotations omitted).

Additionally, Passaniti's arguments on appeal were premised exclusively on state-law grounds. The legal authority cited in Passaniti's appeal brief was limited to Louisiana case and statutory law, and the Louisiana Constitution. The exhaustion requirement "reflects a policy of federal-state comity . . . designed to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' *federal* rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (emphasis added). Accordingly, Passaniti also failed to alert the Louisiana Supreme Court of the federal nature of her excessive sentence claim.

Passaniti is now unable to pursue her Eighth Amendment excessive sentence claim in state court because any such claim would be time-barred. Louisiana has a two-year limitation period for filing post-conviction relief applications. LA. C. CR. P. art. 930.8. Passaniti's conviction became final on June 4, 2015, and thus, refiling this claim in state court would be futile. Petitioner's claims are therefore procedurally defaulted and the Court, by extension, is

barred from undertaking review.[6] *See Bledsue v. Johnson*, 188 F.3d 250, 254 (5th Cir. 1999)

("Procedural default exists where . . . the petitioner fails to exhaust all available state remedies,

and the state court to which he would be required to petition would now find the claims

procedurally barred."); *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995).[7]

A petitioner may be excepted from the procedural default rule if she can show "cause"

for her default and "prejudice attributed thereto," or demonstrate that the federal court's failure to

review the defaulted claim will result in a "fundamental miscarriage of justice." *Glover v. Cain*,

128 F.3d 900, 902 (5th Cir. 1997). To establish cause for a procedural default, a petitioner must

demonstrate that some objective factor external to the defense impeded her efforts to comply

with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The mere fact

that the petitioner failed to recognize the factual or legal basis for a claim, or failed to raise the

---

[6] Procedural default does not bar federal court review of a federal claim raised in a habeas petition unless a substantive or procedural state law ground is "independent and adequate." *Coleman v. Thompson*, 501 U.S. 722, 729-31 (1991). Article 930.8 acts as an independent and adequate state law ground. *See Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997); *MacCracken v. Louisiana*, No. 07-9540, 2008 WL 2951214, *10 (E.D. La. July 25, 2008).

[7] It is well settled that a mixed *habeas* petition should usually be dismissed without prejudice so that the petitioner may either return to the state courts to exhaust his claims or amend his federal petition and resubmit it, raising only the exhausted claims. *Alexander v. Johnson*, 163 F.3d 906, 908 (5th Cir. 1998). Here, however, while Petitioner's claim is not exhausted in the traditional sense, it is "technically exhausted" because no state remedies remain available. *Coleman*, 501 U.S. at 731-33 (holding that a "habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion" because there are no state remedies available to him). In this scenario, "there is no substantial difference between nonexhaustion and procedural default." *Magouirk v. Phillips*, 144 F.3d 348, 358 (5th Cir. 1998). In that respect, the Fifth Circuit has held that when a petition presents both exhausted claims and unexhausted claims that are procedurally barred, the petition should not be dismissed as a mixed petition because there is nothing for the petitioner to exhaust. *Bagneris v. Cain*, 254 F. App'x 351, 352 (5th Cir. 2007); *see also Steele v. Young*, 11 F.3d 1518, 1524 (10th Cir. 1993) (cited with approval in *Sones*, 61 F.3d at 416) ("[I]f it is obvious that the unexhausted claim would be procedurally barred in state court, we will forego the needless 'judicial ping-pong' and hold the claim procedurally barred from habeas review")).

claim or objection despite recognizing it, does not constitute cause for a procedural default. *Id.* at 486.

Here, Petitioner has not offered any cause for her failure to fairly present this claim before the state courts, nor does this Court's review of the record reveal any factor external to the defense that prevented Petitioner from properly raising it. To the contrary, Passaniti argued an excessive sentence claim on appeal, and she could certainly could have urged the same arguments she relies on here. "The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown." *Hogue v. Johnson*, 131 F.3d 466, 497 (5th Cir. 1997).

Claim two is thus procedurally barred from review absent a showing that a fundamental miscarriage of justice will occur if the merits of the claim is not reviewed. *Id*. at 497. To establish a fundamental miscarriage of justice, Petitioner must provide this Court with evidence that would support a "colorable showing of factual innocence." *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986). To satisfy this standard, Petitioner must show that "but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense." *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997). Petitioner makes no argument that a fundamental miscarriage of justice will occur if her claim is not reviewed by this Court. Accordingly, Petitioner has failed to overcome the procedural bar to the claim at issue. Claim two should be **DISMISSED WITH PREJUDICE**.

## Conclusion

For the reasons stated above, **IT IS RECOMMENDED** that the Petition for *habeas corpus* filed by Petitioner Linda Kate Keeney Passaniti, [doc. #29], be **DENIED and DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Passaniti's motion for appointment of counsel, [doc. #30], is **DENIED as MOOT**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this Recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or response to the District Judge at the time of filing. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.** *See* 28 U.S.C. § 2253(c)(2). **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

In Chambers, Monroe, Louisiana, this 7th day of June, 2017.

KAREN L. HAYES

UNITED STATES MAGISTRATE JUDGE